## OTTER TAIL POWER CO., a Corporation, Respondent, v. R. S. CLARK, Appellant.

(229 N. W. 915.)

Opinion filed March 19, 1930.

*Lauder, Heder & Lauder,* for appellant.

*Field & Field* and *Divet, Shure, Murphy & Thorp,* for respondent.

CHRISTIANSON, J. This action involves an electric distribution system in the city of Ashley in this state. For some time prior to January, 1925 the defendant Clark owned and operated an electric light plant in the city of Ashley. On January 7, 1925 he entered into a written agreement with the plaintiff wherein he granted to the plaintiff a sixty-day option to purchase, and agreed to sell to it, the distributing system and generating plant in the city of Ashley for the sum of $23,000.00. On February 25, 1925 the former agreement was supplemented and modified by another written agreement under the terms of which the option granted to the plaintiff to purchase was extended for an addi-

tional period of thirty days. In this latter agreement some of the property covered by the first was omitted, and the purchase price was reduced to $21,500.00. The agreement further provided that if the plaintiff exercised the option, an agreement should be entered into between the plaintiff and the defendant whereby the defendant should lease the property from the plaintiff for a period not to exceed eighteen months at an annual rental of 10 per cent of $21,500.00, such rental to be paid in equal monthly installments. It further provided that if it became necessary for plaintiff to make additions and extensions to the distribution system that the defendant should pay an additional annual rental of ten per cent of the actual cost of such additions and extensions, —such payments to be made in the same manner as the other rental stipulated. On or about March 20, 1925 the plaintiff elected to exercise its option and paid to the defendant the full amount of the purchase price, namely, $21,500.00. On that same day the defendant executed and delivered to the plaintiff a bill of sale. The bill of sale acknowledged the receipt of the sum of $21,500.00 and purported to transfer to the plaintiff the property described in the second option contract and warranted to defend the same against all persons. On that same day the plaintiff and defendant entered into a written lease whereby the property described in the bill of sale was leased to the defendant upon the terms stipulated in the second option contract. Such lease was further supplemented and extended by a written agreement dated August 20, 1926 whereby the property was leased to the defendant for an additional six-month period or until April 1, 1927.

The defendant operated the property under the leases and paid the plaintiff company the stipulated rentals. He remained in possession of the property until June 1927 when the plaintiff took possession, and it has retained possession since that time. The evidence discloses, however, that some time before the plaintiff took possession some disagreement had arisen between the parties. The plaintiff had entered into an agreement to sell its distributing system at Ashley to the Northern Power & Light Company, and during the negotiations and arrangements for a transfer of the property it came to the knowledge of the plaintiff that the defendant Clark had at no time made application to the board of railroad commissioners for authority to sell and transfer the property which he purported to sell and transfer to the plaintiff by the bill of

sale. The plaintiff thereupon requested the defendant to join it in an application to the board of railroad commissioners for permission to sell and transfer the property to the plaintiff. The defendant refused to do so and the plaintiff thereupon, on February 21, 1927, filed an application with the said board of railroad commissioners asking approval of the transfer and sale. On March 7, 1927 a hearing was had upon such application, at which both the plaintiff and the defendant appeared. The defendant opposed the application. A hearing was had, witnesses were examined and counsel heard. On March 19, 1927, the board of railroad commissioners dismissed the application of the plaintiff on the grounds: (1) That the defendant Clark, the seller, had not joined in the application, and (2) that the application sought the ratification of a completed sale or transfer. In the meantime the defendant Clark had instituted an action in the district court of McIntosh county wherein he claimed to be the owner of the property in question and asked that the plaintiff and certain others named as defendants be enjoined from interfering with defendant's possession and enjoyment of the property. An application for a temporary injunction was made and heard on March 29, 1927 before the same judge who tried the present action. The application was denied. No appeal was taken and the action was subsequently dismissed without trial.

After the plaintiff had taken possession of the property it instituted this action. The complaint sets forth in detail the above stated facts. The prayer for relief is that the defendant be required to perform his contracts by making application to the board of railroad commissioners for approval of the sale of the properties in question; and that upon such sale being approved he further be required to execute and deliver a new bill of sale to the plaintiff; also, that the plaintiff have such other and further relief as to the court may seem just and equitable. The case came on for trial in February, 1928. Upon the trial the defendant interposed an answer wherein he asserted that the decision of the board of railroad commissioners finding the bill of sale to be void, had become final and conclusive. He further asserted that he had entered into an agreement with the plaintiff, on or about August 24, 1926, whereby the former transactions had been rescinded and whereby it had been agreed that the plaintiff should return the property to the defendant and the defendant should return to the plaintiff the purchase

price, namely, $21,500.00, and in addition thereto pay the plaintiff any sum it had expended in additional equipment, and that defendant should have a period of six months to raise the money and make the payments. The issues thus raised came on for trial. A great deal of evidence was adduced. The trial court held that the evidence did not establish defendant's claim of rescission; but it further held that the contracts between the plaintiff and the defendant were void for failure to obtain the approval of the sale by the board of railroad commissioners, but that in their arrangements the parties had acted in good faith; that the contract had been fully executed and that the subsequent acts of the defendant Clark in claiming to be the owner of the property, etc., were in bad faith. The court concluded that in the circumstances judgment should be entered that plaintiff was the owner of the property in question as against the defendant subject only to "such rights or limitations as the public may have and assert;" that said defendant by his conduct had become and is estopped to question plaintiff's title or right to possession, and that "to make such estoppel effective and to prevent a multiplicity of actions and breaches of the peace, and to prevent the public from evils incident to a situation liable to lead to disruption of service and certain to militate against the betterment and improvement of the lighting and power system in Ashley" the defendant should be enjoined and restrained from interfering with plaintiff's possession. Judgment was entered accordingly and the defendant has appealed, demanding a trial anew in this court.

The case involves a construction and application of the following section of the Public Utilities Act:

"No public utility shall hereafter sell, assign, lease, transfer, mortgage or otherwise dispose of or encumber the whole or any part of its franchise, works or system, necessary or useful in the performance of its duties to the public nor, at any time, directly or indirectly, merge or consolidate such works or system or franchise, or any part thereof with any other person, corporation or public utility, without first having secured from the commissioners an order authorizing it to do so. Every such sale, assignment, lease, transfer, mortgage, disposition, encumbrance, merger or consolidation made, other than in accordance with the order of the commissioners authorizing the same, shall be void." Laws 1919, chap. 192, § 21; § 4609c21 Supp.

It is the contention of the defendant: (1) That the evidence in the case shows that the defendant never sold the property in question to the Otter Tail Power Company; that the alleged transfer was for security purposes, or part of a tentative arrangement which was never consummated; that it was not intended to be an absolute transfer and that in any event all contracts and agreements between the parties were mutually rescinded on or about August 24, 1926; (2) that if the court should find against the defendant upon the foregoing propositions that it must, in any event, deny plaintiff any relief in this case for the reason that the plaintiff alleges, and the evidence shows, that the contracts under which plaintiff seeks relief, are null and void for the reason that the plaintiff had not secured from the board of railroad commissioners approval of such contracts, leases or agreements before they were made; and that upon application for approval, after their execution, the board of railroad commissioners refused to approve the same. These contentions will be considered in the order stated.

1. As regards the contention of the defendant that the arrangement between the plaintiff and the defendant was merely tentative in form; that the property was merely transferred as security for money borrowed by the defendant from plaintiff and that it was not the intention of the parties to transfer the property to the plaintiff absolutely; and, furthermore, that whatever arrangements had been made were rescinded in August, 1926, it is sufficient to say that both the board of railroad commissioners and the trial court held to the contrary, and that the evidence in the record here leaves no substantial doubt as to the correctness of such holdings. In a memorandum opinion the trial court said:

"The court has analyzed the entire record in this case very carefully, and is well satisfied . . . that the original option contracts and bill of sale and the leases were bona fide instruments, exactly what they purport to be upon their face, and that since March 20, 1925, the defendant R. S. Clark, has had no interest whatever in said property, except such interest as he may have had by reason of his being the lessee of the plaintiff. This undoubtedly was the view of the board of railroad commissioners, as expressed in their opinion. . . .

"The court is also thoroughly convinced that there never was any

rescission of these original contracts, as claimed by the defendant, R. S. Clark, to have taken place in August, 1926.

"The court further believes that both parties at the time of the transfer and sale of the property acted in good faith; that there was no intention on the part of the Otter Tail Power Company to violate any statute of the State in reference to securing the approval of the board of railroad commissioners, and that there was no intention on the part of the defendant, R. S. Clark, at that time to violate any statute of the state. The court is satisfied that it was merely oversight on the part of the plaintiff and also on the part of the defendant, and that if the Otter Tail Power Company at that time had been familiar with the law, or had not forgotten it and had brought the matter to R. S. Clark that he very gladly would have signed an application to the board of railroad commissioners to approve the transfer before the transfer had been actually made."

A careful consideration of the evidence leads us to precisely the same conclusion as that thus announced. The trial court further said:

"The court further feels that a true interpretation of the situation is this: That Mr. Clark, after he had sold the property to the Otter Tail Power Company, and after he had discovered that it was necessary to have the approval of the board of railroad commissioners in order to make it a valid transfer, saw an opportunity to harass the plaintiff and thus compel the Otter Tail Power Company to pay him a further sum, and very likely quite a large one, in order to clear the matter up. He claims in his testimony that he spent some $24,000.00 in improving his plant at Ashley. If he did so, the court is convinced that it was not because of any arrangement that he had with the Otter Tail Power Company, but in spite of any such arrangement. That he had already conceived in his mind the plan of undermining the plaintiff, because he attempted to secure a new franchise from the city of Ashley. Either he anticipated that the Otter Tail Power Company would not complete the high line into Ashley, and therefore would be compelled to use his generating system, or that it would be compelled to buy him out again upon a new basis, or that he would be able to buy back his distributing system from them at a very low figure after he had gotten his plant in good shape. The court is satisfied that Mr. Clark has not acted in good faith toward the plaintiff company, and that he does not come into

a court of equity with clean hands, and that therefore he is entitled to very little consideration at the hands of this court; that he is endeavoring to take advantage of a technicality in order to improve his own condition; that if the defendant would do what he is morally bound to do, he would say to the plaintiff: In order to comply with the terms of our agreement made in good faith, reconvey the property to me temporarily, and I will then make application to the board of railroad commissioners, and after the approval of the board of railroad commissioners is received, I will return the property to you. This is what should be done in this case, but unfortunately men do not always do what they are morally and in good faith bound to do."

When all the facts and circumstances in the case are considered, we are not prepared to say that the trial court has not correctly stated the reasons which animated the defendant Clark in this matter.

2. Defendant's second contention is predicated upon the premise that plaintiff was required to obtain an order from the board of railroad commissioners authorizing the parties to make the agreements entered into between the plaintiff and the defendant, and that having failed to do so, all such agreements became illegal and void; that as regards such illegal transactions the parties are in pari delicto and that, consequently, plaintiff may not predicate a cause of action thereon.

It is true that under the above quoted provision of the Public Utility Act, the defendant was inhibited from selling his utility property to the plaintiff without "first having secured from the commissioners an order authorizing him to do so," and that the sale made without such order is void. The statute, however, did not inhibit the parties from entering into preliminary negotiations and agreeing upon the terms of the sale. The sale, of course, could not become effective or be consummated until the board of railroad commissioners, as representatives of the public, authorized it; but the legislature certainly did not intend that parties before entering into negotiations must obtain the permission of the board of railroad commissioners to do so. Obviously, the board of railroad commissioners could not determine whether it would grant permission to make a sale unless it knew what the terms and conditions of the sale were to be. The legislature did not intend that the commission should have its time occupied with applications for permission to enter into negotiations which might lead nowhere. On the contrary, as we

construe the statute, it was the intention of the legislature that any proposition submitted to the railroad commissioners for approval should be a definite and specific one so that they might know precisely the terms of the proposed transaction and to what extent the interest of the public would be affected thereby, whether the transaction as proposed would be in the interest of the public, and if not, what, if any, changes or modifications must be made to protect the public interests. Hence, while Clark was inhibited from making a sale of the property to the plaintiff and the bill of sale was void, the executory or option agreements were not illegal or invalid and such agreements were not affected by the invalidity of the bill of sale. Certainly, no one would seriously contend that a deed or bill of sale, invalid because executed on Sunday, would also render invalid an anterior executory contract to convey.

The board of railroad commissioners was given supervision over sales of public utility properties in order to make effective the power to "regulate, control, fix rates and charges of all public utilities" which was the object sought to be accomplished by the Public Utility Act. See Laws 1919, chap. 192. The powers thus conferred upon the board of railroad commissioners were so conferred primarily to safeguard the interests of the people. There was no intention to make the board of railroad commissioners a guardian or a wet nurse for the various public utilities. The legislature assumed that the utilities were abundantly able to take care of their own interests; but that on account of the nature of their business it was essential that the rights and interests of the public should be safeguarded and to that end broad powers were given to the commission, as regards the regulation of rates, fares, and tolls and the service to be furnished by the utilities. The supervisory powers over the issuance of stocks and bonds and the lease or sale of utility properties were merely incidental to and a part of the power to regulate rates, fares and tolls. These powers were granted for the protection of the public. As was well said by the Supreme Court of California, in considering a somewhat similar provision in the Public Utilities Act of that state:

"The commission's power is to be exercised for the protection of the rights of the public interested in the service, and to that end alone. The sales, leases, or incumbrances affected by section 51a are dispositions of property of a public utility 'necessary or useful in the performance of

its duties to the public.' The owner may not transfer such properties unless authorized by the commission. All that the commission is concerned with, therefore, is whether a proposed transfer will be injurious to the rights of the public. If not, the owner may be authorized to make the transfer. With the rights of an intending purchaser the commission has nothing to do. Nor has it power to determine whether a valid contract of sale exists, or whether either party has a legal claim against the other under such contract. These are questions for the courts, and not for the railroad commission, which is merely authorized to prevent an owner of a public utility from disposing of it where such disposition would not safeguard the interests of the public. If the owner does not desire to sell, the commission cannot compel him to do so. If, having contracted to sell, he refuses to comply with his contract, the commission is not empowered to determine that he should carry out his bargain." Hanlon v. Eshleman, 169 Cal. 200, P.U.R.1915B, 842, 146 Pac. 657.

The board of railroad commissioners has only such powers, in the regulation of public utilities, as have been conferred upon it by the legislature. Chrysler Light & P. Co. v. Belfield, 58 N. D. 33, 63 A.L.R. 1337, 224 N. W. 871. It goes without saying that the legislature intended that the commissioners should exercise such powers reasonably, and never arbitrarily or capriciously, but, with due regard for the legal rights of the utilities and all persons interested. It will be noted that the provision of the public utilities act in question here says that, "no public utility shall hereafter sell . . . or otherwise dispose of . . . the whole or any part of its franchise, works or system, necessary or useful in the performance of its duty to the public . . . without first having secured from the commissioners an order authorizing it to do so." According to the plain language of this provision, the primary duty to make application to the commissioners for authority to sell or otherwise dispose of a public utility property rests upon the seller. The statute, however, nowhere says that the commissioners are without authority to consider or determine whether a proposed sale of a public utility property shall be authorized except upon the application of the seller. On the contrary, the act construed as a whole clearly indicates that there is no such limitation. A person who enters into a contract to sell a utility property, which contract in order to become ef-

fective must have the approval of the board of railroad commissioners, certainly vests in the proposed purchaser a sufficient interest to entitle him to make application to such board for approval of the proposed sale. It is a maxim of our jurisprudence that, "that which ought to have been done is to be regarded as done in favor of him to whom and against him from whom performance is due." Comp. Laws 1913, § 7263.

When the defendant purported to make a sale to the plaintiff, and executed and delivered to it the bill of sale and received from it the purchase price, he warranted, among other things: (1) That he had a right to sell the property; and (2) That the buyer should have and enjoy quiet possession of the property as against any lawful claims in existence at that time. Laws 1917, chap. 202, § 13; § 6002a13, Supp. See also 1 Williston, Sales, 2d ed. § 216.

It would indeed be strange if the legislature (in the public utility act) had provided that the owner of a public utility might with impunity perpetrate a fraud by warranting to one who desired to purchase a utility property that he (the owner) had authority to make such sale and upon the strength of such warranty receive the purchase price; thereupon in violation of the law, and in defiance of the regulatory authorities, in form, make a sale; and thereafter be permitted to assert that because of such unlawful conduct on his part the person whom he has defrauded must take the consequences; and the regulatory authorities are without power to deal with the situation and take such action as they might have taken but for his illegal conduct. But the legislature has made no such provision. In the case stated, the owner of the utility is not above the law, or beyond the reach of its administrative arm. We are wholly agreed that in such case the board of railroad commissioners, upon notice to the parties, has full power to consider the matter and make whatever order the facts in the case may warrant within the range of its regulatory powers. In short, it has authority to make such order as it could and would have made if the owner had made application for authority to sell the property in the first instance. Hence, as we view the case, it is not at all necessary that an application to the board of railroad commissioners for an approval of the contract for sale evidenced by the option contracts be signed by the defendant; but the plaintiff is entitled to make and present such application, and

upon its being duly presented it becomes the duty of the board of railroad commissioners to determine whether the sale should or should not be authorized, the same as in other cases, having in mind at all times the fundamental question, how the public interests will be affected thereby. In the circumstances there is no need for the rendition of a decree directing the defendant to make application for the approval of the sale and it becomes wholly unnecessary to determine whether such decree might or might not properly be entered.

As said, the trial court rendered judgment that the defendant be enjoined from interfering with plaintiff's possession of the property, and defendant contends that the trial court erred in so doing for the reason that the statute (Comp. Laws 1913, subd. 5, § 7214) provides that an injunction cannot be granted to prevent the breach of a contract, the performance of which could not be specifically enforced; and that inasmuch as the contracts here could not be specifically enforced against the defendant the court was without authority to grant injunctive relief against him. A sufficient answer to these contentions is that when the legislature enacted the statute relied upon by the defendant, it, at the same time, specifically defined and enumerated the obligations that cannot be specifically enforced in this state. See §§ 7197, 7198, Comp. Laws 1913. And the agreements in question here are not among those so enumerated. Hence there is no statutory inhibition against the granting of injunctive relief.

The defendant further contends, however, that inasmuch as the sale was illegal both parties thereto were and are in pari delicto and that, consequently, under the familiar principle that one who has himself become a party to a transaction or contract forbidden by law cannot be permitted to assert in a court of justice any right founded upon or growing out thereof, the court should not have granted any relief to the plaintiff.

A careful consideration of the facts and circumstances in the case leads us to the conclusion that the trial court was justified in granting injunctive relief against the defendant. While it may be said that both parties are in delicto, it cannot be said that they stand in pari delicto. Story, Eq. Jur. § 300; Rozell v. Vansyckle, 11 Wash. 79, 39 Pac. 270; 2 Pom. Eq. Jur. 4th ed. § 942. As has been noted the primary duty to obtain the authorization of the board of railroad com-

missioners to make the sale was upon the defendant and not upon the plaintiff. The defendant failed to perform this duty and warranted to the plaintiff that he had a right to make the sale; and upon such warranty being made, it paid to him the purchase price. Furthermore, in this case, rights of others than the plaintiff and defendant are involved; and such other persons are not in pari delicto. The controversy here involves a public utility property which is being used to furnish light and power to a large number of people. The interests of a municipality and its people are directly involved. In the circumstances the court might, with entire propriety, have granted injunctive relief against the defendant even though the plaintiff and defendant are in pari delicto. Seattle Electric Co. v. Snoqualmie Falls Power Co. 1 L.R.A. (N.S.) 1032; 2 Pom. Eq. Jur. 4th ed. §§ 941, et seq.; Broom, Legal Maxims 8th ed. p. 728. See also Basket v. Moss, 48 L.R.A. 842; Meech v. Lee, 82 Mich. 274, 46 N. W. 383. The fundamental principle that courts will not grant relief to any party to an illegal contract or transaction but will leave such party where it finds him, was not established for the benefit of either of the parties to such contract or transaction; but is a maxim of law founded on principles of public policy. Broom, Legal Maxims, 8th ed. p. 721; 3 Williston, Contr. § 1630. Hence, when a situation is presented where because of public interests relief ought to be granted to protect such interests, the court may do so in compliance with the demands of public policy even though this incidentally results in granting relief to one of the parties to the illegal transaction. Seattle Electric Co. v. Snoqualmie Falls Power Co. 1 L.R.A.(N.S.) 1032, supra; 2 Pom. Eq. Jur., 4th ed. § 941; Broom Legal Maxims, 8th ed. p. 728; Basket v. Moss, 48 L.R.A. 842, supra; Meech v. Lee, 82 Mich. 274, 46 N. W. 383, supra. The granting of the injunction in this case in effect merely leaves the parties where the court found them and safeguards the public interests. The undisputed evidence shows that the plaintiff in this case is in possession of the utility property and has been in possession and operating the same for a considerable period of time. Interference with the possession and operation of such property would in all likelihood result in injury to the parties who are being supplied with electric current. If the board of railroad commissioners had been of the opinion that continued possession and operation by the plaintiff would be injurious to

public interest, it can hardly be assumed that such board would not have taken some affirmative action to remedy the condition which was presented to them. To assume otherwise would be to convict them of dereliction of duty. In all the circumstances we think the trial court was fully justified in enjoining the defendant from interfering with plaintiff's possession of the property. The judgment appealed from is affirmed.

BURKE, Ch. J., and BIRDZELL, NUESSLE, and BURR, JJ., concur.