**FIRST NATIONAL BANK OF WHITE RIVER JCT., VERMONT, and Valley Land Corporation, Intervenors-Appellants,**

**v.**

**Norman E. REED, Receiver in Bankruptcy of Hathorn's Transportation Co., Inc., Rene Deforge, et al., and United States of America, Appellees.**

No. 341, Docket 27362.

United States Court of Appeals
Second Circuit.

Argued June 11, 1962.

Decided July 16, 1962.

John D. Carbine, Rutland, Vt., for appellant Valley Land Corporation (Christopher A. Webber, Rutland, Vt., for appellant First National Bank of White River Jct., Vermont, on brief).

John S. Burgess, Brattleboro, Vt., for receiver (Robert M. Rosenberg, Jr., Burlington, Vt., for Rene Deforge and others, on brief).

Stephen B. Wolfberg (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Joseph Kovner, Joseph F. Radigan, Attys., Dept. of Justice, Washington, D. C.), for the United States.

Before FRIENDLY, KAUFMAN and HAYS, Circuit Judges.

FRIENDLY, Circuit Judge.

First National Bank of White River Junction and Valley Land Corporation, hereafter Valley, appeal, 11 U.S.C.A. § 47, from an order of the District Court for Vermont which decreed that certain mortgages on property of a bankrupt

held by appellants were invalid for lack of approval by the Vermont Public Service Commission as required by 30 V.S.A. § 107. The propriety of the order is supported by the receiver in bankruptcy, by general creditors, and by the United States. The latter has tax claims against the bankrupt, some of which became liens after recordation of the mortgages but before bankruptcy, and others of which, under § 64, sub. a(4) of the Bankruptcy Act, 11 U.S.C.A. § 104, sub. a(4) will also prevail over appellants if the mortgages are held to be void.

The parties have agreed as to the facts: The bankrupt, Hathorn's Transportation Co., Inc., a Vermont corporation, was a small motor carrier, holding certificates from the Vermont Public Service Commission and the Interstate Commerce Commission. In January, 1956, it bought land and a terminal building owned by Valley in Hartford, Vermont. To finance the purchase, Hathorn's borrowed $30,000 from First National Bank of White River Junction, for which it issued its promissory note, payable over a 12 year period, secured by a first mortgage on the terminal, and gave Valley a $15,000 note, payable over 15 years, secured by a second mortgage. In the mortgages Hathorn's warranted that it had "good right and title to convey" the premises. In February, 1958, Hathorn's was adjudicated a bankrupt and a receiver was appointed. At that time it owed $26,494.76 to First National Bank and $13,831.32 to Valley, together with interest from mid-November, 1957. Later, the District Court approved a sale of Hathorn's assets for $75,200 free and clear of liens, which, however, were to attach to the proceeds. An appraisal indicated the value of the mortgaged premises to be $45,500.

At the time of the issuance of the notes and mortgages Hathorn's was subject to the jurisdiction of the Vermont Public Service Commission under 30 V.S.A. § 107, then providing, so far as material, as follows:

> "§ 107. *Issue of bonds or other securities*
>
> "A domestic corporation subject to the jurisdiction of the public service commission shall not mortgage nor pledge any of its corporate property nor issue any stocks, bonds, notes or other evidences of indebtedness or change its shares as provided in section 270 of Title 11 without the consent of the public service commission given on petition and after hearing of the corporation or its incorporators. Notice of the hearing shall be given as the commission directs.
>
> \* \* \* \* \* \*
>
> "Nothing in this section shall restrict the right of a common carrier by motor vehicle to issue evidences of indebtedness payable within one year from the date of issue without prior notice to or consent by the commission."

No consent of the Commission to the notes and mortgages issued to First National Bank and Valley was obtained.[1] The receiver claimed that on that account the mortgages were void; he made no such contention with respect to the notes. The referee overruled him; the District Judge reversed the referee.

It is agreed that, as stated by the District Judge, the statute which is now 30 V.S.A. § 107 "has never been construed by the Supreme Court of Vermont." Appellants stress that § 107 contains no provision that securities issued without the Commission's approval shall be void, a provision frequently encountered in statutes of this sort, of which § 20a(11) of the Interstate Commerce Act, added

---

1. Section 214 of the Federal Motor Carrier Act, subjecting motor carriers to paragraphs (2)–(11) of § 20a of the Interstate Commerce Act with respect to the issuance of securities, does not apply when, as here, the total amount of outstanding securities does not exceed $1,- 000,000, 49 U.S.C.A. § 314. Appellants have not contended that the Federal statute "occupied the field" to the exclusion of Vermont's. See People v. County Transp. Co., 303 N.Y. 391, 103 N.E.2d 421 (1952).

by Transportation Act, 1920, 41 Stat. 496, 49 U.S.C.A. § 20a(11), will serve for the moment as an example. They might well have buttressed this argument by seeking to invoke the statement in Kerfoot v. Farmers' & Merchants' Bank, 218 U.S. 281, 286–287, 31 S.Ct. 14, 54 L.Ed. 1042 (1910), that "although the statute by clear implication forbids a national bank from making a loan upon real estate, the security is not void and it cannot be successfully assailed by the debtor or by subsequent mortgages because the bank was without authority to take it; and the disregard of the provisions of the act of Congress upon that subject only lays the bank open to proceedings by the Government for exercising powers not conferred by law,"—even though the situations are not completely parallel. See also National Bank v. Matthews, 98 U.S. 621, 627, 25 L.Ed. 188 (1879), and Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 750–752, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947). Appellants say that Vermont imposes other sanctions quite sufficient to promote compliance with § 107, without need for the courts to imply the ultimate one of utter invalidity. They point to 30 V.S.A. § 245, providing that "A person or the officers of an association or corporation who violates * * * any provision of this chapter shall be fined not more than $100.00 or imprisoned not more than sixty days, or both." They cite also 30 V.S.A. § 30, empowering the Commission, now called the Board, to bring an action in a county court or a court of chancery for mandamus or injunction whenever it "is of the opinion that a company subject to its supervision is failing or omit-

ting or about to fail or omit to do anything required of it by law * * *."[2] Since injunction is an equitable remedy and mandamus also is governed by equitable principles, Duncan Townsite Co. v. Lane, 245 U.S. 308, 312, 38 S.Ct. 99, 62 L.Ed. 309 (1917); United States ex rel. Greathouse v. Dern, 289 U.S. 352, 359, 53 S.Ct. 614, 77 L.Ed. 1250 (1933); Whitehouse v. Illinois Cent. R.R. Co., 349 U.S. 366, 373, 75 S.Ct. 845, 99 L.Ed. 1155 (1955), it is quite possible that in such a proceeding a court would grant appellants something in the nature of restitution if they had acted in good faith, as seems not to be questioned, especially in the absence of a showing that anyone had been prejudiced, see 6A Corbin, Contracts (1962) §§ 1534, 1535, 1540; American Law Institute, Restatement of Contracts, § 599, Restatement of Restitution, § 140. Indeed, the court might simply require the utility, (or permit the mortgagees) to apply for approval by the Commission nunc pro tunc, cf. Otter Tail Power Co. v. Clark, 59 N.D. 320, 229 N.W. 915 (1930), and withhold further action until the Commission had ruled thereon.[3] Appellants further argue that their mortgages are entitled to protection as a vendor's lien, 27 V.S.A. § 307, and that even if the mortgages are void because of failure to obtain Commission approval, a bankruptcy court, which likewise applies equitable principles, Bardes v. Hawarden First Nat. Bank, 178 U.S. 524, 535, 20 S.Ct. 1000, 44 L.Ed. 1175 (1900), should permit appellants to rescind the transaction and receive back the land and terminal or, since that is not possible, what the purchaser paid for it on the sale.

2. Pointing out that § 30 was not in the statute in 1956, having been added by Law No. 263 of 1961, appellees argue that it has no relevance to the meaning of § 107 in 1956. The conclusion is not a necessary one; the Vermont legislature of 1961 might have recognized that the statute needed supplementation. Moreover, the Commission has long had authority to "complain to the supreme court for relief against any disobedience of or noncompliance with" its orders or decrees, 30 V.S.A. § 15.

3. Compare Re Firth Telephone Co., P.U.R.1915C, 24 (Nebraska); Re Peoples Co-op. Telephone Co., P.U.R.1928D, 528 (Indiana). In contrast, the California Commission, operating under a statute which declares void securities issued without its approval, has refused to ratify unapproved issues; it has instead authorized the reissue of the void securities as of the date of approval. Re Richards Trucking & Warehouse Co., P.U.R.1926E, 342; Re Henneken, 40 P.U.R. (N.S.) 51 (1941).

The District Judge concluded that the Referee had been "clearly erroneous" in sustaining the mortgages. His view was based in part upon Krulee v. F. C. Huyck & Sons, 121 Vt. 299, 156 A.2d 74 (1959), and in part upon his feeling that "the purpose behind the statute here involved was to prevent a public service corporation from giving certain creditors preference without approval being given by the now Public Service Board." We find difficulty with the latter concept. No preference is given, either in the technical bankruptcy sense or in any other, when a corporation purchasing property issues mortgages not greater than the property's worth. Moreover, the Vermont statute is no more directed against mortgages than against stocks or notes, yet the decision below, while striking down appellants' mortgages, allows their notes to be proved as general claims, a view which, if also applied to debentures, would approximate the very result for which appellants contend.

Neither do we consider the Krulee decision to have more than superficial relevance. That case arose under § 108 of the Vermont statute, which prohibits, *inter alia*, a corporation subject to the Commission's jurisdiction from making "a sale or lease or series of sales or leases in any one calendar year constituting ten per cent or more of the company's property located within this state and actually used in or required for public service operations * * * except after hearing by the public service commission and a finding by such commission that the same will promote the general good of the state." A purchaser under a contract to acquire such property, which had not been approved by the Commission, sued to recover a down payment on account of the purchase price. The contract required the seller to furnish "good and clear record and marketable title." The Supreme Court of Vermont sustained a plaintiff's verdict on the ground that "Without the consent of the Public Service Commission the defendant could not convey a clear and marketable title as it was required to do."

This was a long way from the Court's saying that if a deed had been delivered, no title would have passed, cf. Otter Tail Power Co. v. Clark, supra, so that creditors of an insolvent seller could disregard the conveyance and attach the property —a result equivalent to what the general creditors and the United States are seeking in this case. The fact that the transaction in Krulee was largely executory made the consequences of upholding the claim of illegality far less drastic than here, where it has been carried out. Indeed, quite apart from the point as to "marketable title," the Krulee case would have had to be decided as it was under the recognized principle that "Where money has been paid or goods delivered under a bargain containing illegal provisions the money or the value of the goods can be recovered so long as the illegal part of the bargain is wholly unexecuted, unless entering into the bargain involves serious moral turpitude on the part of the plaintiff." American Law Institute, Restatement of Contracts, § 605; 6 Williston, Contracts (rev. ed. 1938) § 1788; Adams-Mitchell Co. v. Cambridge Distributing Co., Ltd., 189 F.2d 913, 916 (2 Cir. 1951). Refusal to allow rescission to a buyer under the circumstances presented in Krulee would have rather inescapably carried the corollary that the court would have had to grant him specific performance or damages if the seller defaulted, thereby implicating itself in the very transaction the legislature forbade. That would be asking a good deal; as Professor Corbin points out, "As long as an 'illegal' bargain remains wholly executory, no performance of any kind having as yet been rendered under it, cases are relatively few in which a judicial remedy will be sought or will be granted," supra, § 1534, at p. 817; "but there are numerous cases in which Restitution will be adjudged even though a judgment for money damages would be refused," supra, § 1535, at p. 822. We therefore turn to other materials for light on what the Vermont legislature considered the consequences of failure to secure the Commission's approval to be.

The Vermont statute is an early one, going back to 1908, Public Acts, No. 116, § 16. It was a part of the wave of state legislation for the regulation of public utilities, including their issuance of securities, adopted in that era, of which the 1907 acts of Wisconsin, Wis.Laws 1907, chs. 499 and 576, and of one of Vermont's neighbors, New York, N.Y.Laws 1907, ch. 429, the latter enacted under the leadership of Governor Charles Evans Hughes, were the most widely known.

There had been earlier state legislation regulating the issuance of securities by public utilities. The history in another of Vermont's neighbors, Massachusetts, is reviewed in Fall River Gas Works Co. v. Board of Gas and Electric Light Commissioners, 214 Mass. 529, 102 N.E. 475 (1913). Notable in that commonwealth was the Statute of 1894, ch. 450, § 1, providing that "gas companies and electric light companies * * * shall hereafter issue only such amounts of stock and bonds, as may from time to time, upon investigation by the board of gas and electric light commissioners be deemed and be voted by them to be reasonably requisite for the purposes for which such issue of stock or bonds has been authorized." In Attorney General v. Massachusetts Pipe Line Gas Co., 179 Mass. 15, 20–21, 60 N.E. 389, 390–391 (1901), the Supreme Judicial Court held "that the act is not directory, merely, but is, so to speak, jurisdictional", with the result, when stock had been issued without authority, that "the money paid in by the subscribers was paid without consideration, and that it was not assets of the corporation which could be used by it in its business, and that it did not represent an issue of capital stock", so as to be taxable as such. Whether the stockholders could get their money back, the Court did not say.[4]

The Massachusetts history is thus favorable to appellees, although they have not cited it.[5] However, it does not stand alone, and other chapters of history, also for the most part not called to our attention by the parties, point in the opposite way.

Another early security regulation act was that of Texas. In this statute, relating to railways, Texas Laws 1893, ch. 50, § 11, the legislature specifically provided that "Every certificate of stock in any railroad company, and every bond and other evidence of debt operating as a lien upon the property of any such railroad company, which shall be made, issued or sold without a compliance with this act, shall be void."[6] Perhaps it is unrealistic to expect that the legislators in Montpelier should have known in 1908 what had been done in Austin fifteen years before. But it is not supposing so much to think they might have been aware of the widely discussed Wisconsin statute of 1907. There, as in Texas, the legislature, perhaps following the Supreme Court's suggestion that if it meant a security to be void, "it would have been easy to say so * * * instead of leaving the question to be settled by the uncertain result of litigation and judicial decision," National Bank v. Matthews, supra, 98 U.S. at 627, 25 L.Ed. 188, had made its intention utterly clear: "All

---

4. In Augusta Trust Co. v. Federal Trust Co., 140 F. 930 (C.C.D.Mass.1905), aff'd, 153 F. 157 (1 Cir. 1907), a street railway, which could not issue bonds without the approval of the board of railroad commissioners and had issued $150,000 of mortgage bonds with such approval, issued $15,000 of notes, exchangeable into $18,000 of mortgage bonds when issuance of the latter was approved by the commissioners. The street railway having gone into receivership before any such approval, the courts held the note-holders could not share in the mortgage.

5. Although the Massachusetts statute did not expressly declare an unauthorized issue void, the regulatory scheme of which it was a part involved a most extensive role for the state commission, which was authorized to set the price of the issue, a power whose existence was loudly decried by the regulated utilities. See Barnes, Public Utility Control in Massachusetts (1930) 36–44.

6. The statute was applied, in accordance with its terms, in Davis v. Watertown Nat. Bank, 178 S.W. 593 (Tex.Civ.App. 1915).

stocks, certificates of stock, bonds and other evidences of indebtedness issued contrary to the provisions of this act shall be void." Wis.Laws 1907, ch. 576, § 1753–8.

The New York statute of 1907, probably still better known in Vermont, contained no such express provision as Wisconsin's. It said that "a common carrier, railroad corporation or street railroad corporation * * * may issue stocks, bonds, notes or other evidence of indebtedness payable at periods of more than twelve months after the date thereof * * * provided and not otherwise that there shall have been secured from the proper commission an order authorizing such issue" etc., N.Y.Laws 1907, ch. 429, § 55; a similar provision was enacted with respect to gas and electrical corporations, § 69. Vermont's statute of 1908 followed the New York rather than the Texas and Wisconsin model.

A few years later a New York court had occasion to pass on what its statute meant in the context with which we are here concerned. In Goldan v. Delaware & E. Ry. Co., 144 App.Div. 78, 128 N.Y.S. 936 (1st Dept.1911), brokers whom a railroad had employed to negotiate a bond issue took their fee in $85,500 of bonds which the railroad allegedly represented it was authorized to issue whereas, in fact, the Public Service Commission had prohibited its doing so. The railroad having become insolvent, an assignee of one of the brokers sued it and its officers for fraud. The court sustained a demurrer, saying that "if bonds were issued in disobedience of the order of the commission, or without the authority of the commission, the corporation and its officers subjected themselves to the penalties provided in the act. But that is far from saying that the corporation could plead its ultra vires act as a defense to a suit on the bonds at the in-

stance of one who received them in good faith." We have found no later relevant judicial construction of the New York law. Cf. People ex rel. Cayuga Power Corp. v. Public Service Commission, 226 N.Y. 527, 124 N.E. 105 (1919).

Over the years other states have adopted statutes, like those of Texas and Wisconsin, expressly voiding security issues of public utilities which failed to secure required commission approval; an article published in 1928, Waltersdorf, State Control of Utility Capitalization, 37 Yale L.J. 337, 340–341 (1928), listed Arizona, California, the District of Columbia, Illinois, Kansas, Maine and Ohio.[7] Also there was the provision of § 20a(11) of the Interstate Commerce Act, mentioned above, adopted as to railroads by Transportation Act, 1920,[8] and made applicable, to a limited extent, to motor carriers by the Motor Carrier Act, 1935, 49 Stat. 557.[9] On the other hand, a goodly number of states regulating security issues by public utilities, including another of Vermont's neighbors, New Hampshire Rev.Stat.Ann. § 369:1, have not expressly made unauthorized issues void. Between 1908 and 1956 Vermont legislated repeatedly on the subject dealt with in § 16 of Law No. 116 of 1908—notably in 1915, Law No. 163, 1925, Law No. 83, 1949, Law No. 137, and 1951, Law No. 118. Yet no action was taken to include the language, used by many other states and the Federal government, that would so easily have put a legislative intent to void unauthorized issues beyond all doubt.

Indeed, such significant change as there was in Vermont until 1961 seems to have been in the direction of weakening the statute. The 1908 Act had provided that the commission must be "satisfied that such corporation ought to be permitted" to issue the new securities "and that the same is required for the proper development of the business of such corpora-

---

7. Appellants' brief cites similar statutes in Missouri and Oregon.

8. The history of this legislation is summarized in the dissenting opinion of Chief Justice Stone in New York, C. & St. L. R. R. Co. v. Frank, 314 U.S. 360, 387

footnote 3, 62 S.Ct. 258, 86 L.Ed. 277 (1941).

9. No counterpart of § 20a(11) is contained in the securities section of the Federal Power Act of 1935, 16 U.S.C.A. § 824c.

tion, and that the same will be promotive of the general good of the public * *." The 1915 legislation provided merely that securities could not be issued "except with the consent of the public service commission given on petition and after hearing," Law No. 163, § 6, and this, save for immaterial verbal changes, was still the status in 1956. All that was left in the way of an express standard to govern the Commission's action on security issues was that in § 9 of the 1908 Act, which had remained in effect, listing, among the Commission's general powers, "jurisdiction in all matters respecting * * * VII. The issue of stock, mortgages, bonds or other securities in order to prevent over-capitalization as hereinafter provided." Not until 1961 did Vermont's legislature restore the earlier requirement of "a finding * * * that the proposed action will be consistent with the general good of the state"— even then it did not reenact the further specification that the issue "is required for the proper development of the business of such corporation." Citing a 1949 Commission case saying that there "the sole question before this Commission is whether the issue of securities proposed will result in the overcapitalization of the petitioner," New England Power Co., No. 2466, and construing "overcapitalization" to mean only an issue exceeding the value of the property acquired, appellants argue that the Vermont legislature could scarcely have meant to void unapproved issues of securities when the Commission, under the rather limited power confided to it, would have been bound to approve most of them, including this one, in any event. However, we are not certain that "overcapitalization" has quite so narrow a meaning

as appellants urge, even if we were to assume that between 1915 and 1961 the Commission's power was limited to preventing that.[10]

Where does all this leave us? The only candid answer is that it leaves us with no real idea whether the Supreme Court of Vermont would hold the mortgages void or would say at most that although, in the absence of Commission approval, they cannot be enforced as such, parties who have acted in good faith will still be protected against subsequent lienors or other creditors in the event of insolvency, at least in the absence of a showing that detriment was caused. The difficulty is not simply the lack of any significant indication in the Vermont decisions and the opposing inferences that can be drawn from the history in other states, but the variety of choices the Vermont court would have. If we were to make guesses, we would make opposite ones, with Judge Kaufman backing the District Judge's result and Judge Hays and I the referee's—but all three of us would be grasping at straws. Nor is the problem one that can be solved by the facile course of giving special weight to the conclusions of a judge from the state whose law is in question, see Bernhardt v. Polygraphic Co. of America, 350 U.S. 198, 204, 76 S.Ct. 273, 100 L.Ed. 199 (1956). Here the referee and the district judge, both Vermont lawyers, have come to opposite conclusions, the former not giving reasons, the latter relying on considerations which on their face are at best collateral to the issue, and neither having the benefit of the relevant history here summarized.

The Supreme Court has indicated the proper course for a bankruptcy court to follow in such a case, although no one

10. See Barnes, Public Utility Control in Massachusetts (1930) 76–79; Heaton, The Control Exercised by the Michigan Public Utilities Commission Over the Issuance of Corporate Securities, 12 Mich. St.B.J. 199, 211 (1933); Legislation, Regulating the Issuance of Securities by Public Service Corporations—the Problem in Pennsylvania, 7 Temple L.Q. 353, 355–357 (1933); Comment, Regulation of Security Issues of Public Utilities by the New York Public Service Commission, 1929–1949, 22 Fordham L.Rev. 77, 89–90 (1953). Compare Re Northern Light & Power Co., P.U.R.1924B, 813, 818, with Re Brooklyn Union Gas Co., 55 P.U.R. (N.S.) 3 (1944), and Re New York State Electric & Gas Corp., 67 P.U.R. (N.S.) 321 (1946).

has asked that it be taken here. In Thompson v. Magnolia Petroleum Co., 309 U.S. 478, 483–484, 60 S.Ct. 628, 84 L.Ed. 876 (1940), the Supreme Court directed that a bankruptcy trustee be ordered to institute proceedings in the courts of Illinois to determine an unsettled question of state law controlling the fee ownership of land, in the possession of the estate, on which the District Court (there for Eastern Missouri) and the Court of Appeals for the Eight Circuit had reached conclusions different from each other and, in the instance of the Court of Appeals, from the Seventh Circuit. The Supreme Court's reasoning was that "Unless the matter is referred to the state courts, upon subsequent decision by the Supreme Court of Illinois it may appear that rights in local property of parties to this proceeding have—by the accident of federal jurisdiction—been determined contrary to the law of the State, which in such matters is supreme." Accord, Mangus v. Miller, 317 U.S. 178, 186, 63 S.Ct. 182, 87 L.Ed. 169 (1942); In re Central R. Co. of New Jersey, 163 F.2d 44 (3 Cir.), cert. denied, Gardner v. State of New Jersey, 332 U.S. 810, 68 S.Ct. 112, 92 L.Ed. 388 (1947); Gramil Weaving Corp. v. Raindeer Fabrics, Inc., 185 F.2d 537 (2 Cir.1950). Similarly, directing the receiver here to institute appropriate proceedings in the Vermont courts, under Vermont's Declaratory Judgments Act, 12 V.S.A. ch. 167, or otherwise, will prevent what might be either a failure to grant full effect to Vermont's policies for the regulation of its public utilities or a harsher application of them than Vermont itself would give.

The interest of a state in the proper interpretation of its scheme for the regulation of local public utilities is quite as great as that in its land law, Thompson v. Magnolia Petroleum Co., supra, or in its law of eminent domain, Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 79 S.Ct. 1070, 3 L.Ed.2d 1058 (1959). Even the three Justices who protested against Federal abstention in Clay v. Sun Insurance Office Ltd., 363 U.S. 207, 213, 80 S.Ct. 1222, 4 L.Ed.2d 1170 (1960), distinguished cases calling "for first interpretation of a broad, many-pronged, state regulatory scheme" and "peculiarly local questions such as the eminent domain power a State has allowed a city to exercise, or the local land law of a State," citing the Thibodaux and Thompson cases, supra. Moreover, the issue does not here arise in a diversity action, see Meredith v. City of Winter Haven, 320 U.S. 228, 236–238, 64 S.Ct. 7, 88 L.Ed. 9 (1943), and County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959), where "abstention," in the cited cases taking the extreme form of dismissal, may be thought inconsistent with one of the very reasons for Federal jurisdiction in suits between citizens of different states, namely, the desire that Federal judges should independently determine all legal issues, even close questions of state law, see Note, Judicial Abstention from the Exercise of Federal Jurisdiction, 59 Colum.L.Rev. 749, 778 (1959). Here Federal jurisdiction rests on bankruptcy, and the Bankruptcy Act contains several provisions looking toward state court determination of issues arising in the administration of bankrupt estates, see §§ 11, 23, sub. b, 57, sub. h, 11 U.S.C.A. §§ 29, 46, sub. b, 93, sub. h. As said by Mr. Justice Black in the Thompson case, an order to a trustee to have an unsettled question of state law determined in the state courts "will be comparable to one in which the bankruptcy court, preserving the status quo the while, orders a trustee to determine in a plenary state court suit the legal right to property alleged by the trustee to have been fraudulently transferred by its bankrupt," 309 U.S. at 483, 60 S.Ct. at 630, citing in a footnote Steelman v. All Continent Co., 301 U.S. 278, 57 S.Ct. 705, 81 L.Ed. 1085 (1937), and Scott v. Gillespie, 103 Kan. 745, 176 P. 132 (1918), cert. denied, 249 U.S. 606, 39 S.Ct. 289, 63 L.Ed. 799 (1919), where a trustee had been ordered into a state court to determine a question as to the construction of a will. If the mortgaged premises had not been sold, § 57 sub. h

would clearly authorize the bankruptcy court to permit the mortgages to be foreclosed in a state court, where any question as to their status could be raised. We see no reason why a similar procedure should not be followed when the premises have been sold and the liens of the mortgages, if liens they be, have been transferred to the proceeds.

It may be said against this that, realistically, the Supreme Court of Vermont will be in no better position than we are to determine what its legislature intended. We cannot say that is so. The Vermont Court may have access to materials bearing on legislative history, at least as to 1961 if not as to 1908, which we do not. Moreover, Mr. Justice Holmes' remark with regard to a system of foreign law is not inapplicable to the statute law of a state: "to one brought up within it, varying emphasis, tacit assumptions, unwritten practices, a thousand influences gained only from life, may give to the different parts wholly new values that logic and grammar never could have got from the books", Diaz v. Gonzalez, 261 U.S. 102, 106, 43 S.Ct. 286, 67 L.Ed. 550 (1923). Even if, after all this, a considerable area of conjecture should remain, it is better that the "common will" of Vermont on so close an issue of regulatory policy, see L. Hand, The Spirit of Liberty (1952) 108–109, be pronounced by its own Supreme Court rather than by three New Yorkers, and that it be pronounced in a way that will bear equally upon all persons similarly situated rather than that these appellants should be treated either more or less severely than Vermont would treat their future counterparts. Recognizing that the amount here at stake is not large and that further postponement in winding up this estate is unfortunate, we still think that the expense and delay in now submitting these agreed facts to the Vermont courts, as could so easily have been done at the outset, had better be borne than that "the accident of federal jurisdiction" arising from bankruptcy should lead to an application of Vermont's regulatory statutes either more or less drastic than would have occurred in a suit by the Public Service Commission for mandamus or injunction or in a foreclosure or receivership in a Vermont court.

The judgment is vacated and the case remanded to the District Court which is to direct the receiver to institute appropriate proceedings in the Vermont courts, with notice to the Attorney General of Vermont, to determine the status of appellants' notes and mortgages, and appellants' rights to the proceeds of the sale of the mortgaged premises.